# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:

SARAH L. GUTHRIE,

          Debtor.

Case No. A11-00755-DMD
Chapter 13

**Filed On 4/18/12**

## MEMORANDUM ON OBJECTION TO CLAIM NO. 9

David Guthrie, the debtor's ex-husband, has filed a priority proof of claim in the sum of $23,707.71. The debtor, Sarah Guthrie, has filed an objection to the claim. An evidentiary hearing on the claim was held on April 6, 2012. After considering the debtor's objection and the evidence presented at the hearing, I conclude that David Guthrie does not have a priority claim. He does have a general unsecured claim for $20,228.05. The debtor's objection to claim will be sustained, in part.

The parties participated in a divorce mediation with Judge John Reese on May 16, 2011. As a result of the mediation, findings of fact and conclusions of law were entered by the state superior court. The findings were adopted in a divorce decree dated July 25, 2011. They were amended on two occasions; the second amended findings of fact and conclusions of law were entered in state superior court on September 27, 2011.[1] All versions of the findings and conclusions contained the same provisions regarding the division

---

[1] Creditor's Ex. E (Second Am. Findings of Fact and Conclusions of Law entered in Anchorage Superior Court Case No. 3AN-11-4958 CI).

of Sarah's employee profit sharing plan. Under a heading in the findings entitled "PROPERTY DISTRIBUTION," Sarah was to receive:

> Forty percent of the value as of May 16, 2011, plus or minus any gains or losses on those shares as of the date of distribution, of the Grainger Profit Sharing Plan #093114 to be divided by QDRO. Sarah Guthrie is to pay the costs to obtain the QDRO to be drafted by David Watson.[2]

Under this same heading, the findings provided that David was to receive:

> Sixty percent of the value as of May 16, 2011, plus or minus any gains or losses on those shares as of the date of distribution, of the Grainger Profit Sharing Plan #093114 to be divided by QDRO.[3]

None of the findings and conclusions entered by the state superior court contained a provision for the support of either of David or Sarah.

Sarah did not honor the provision in the findings regarding distribution of her profit sharing plan. She did not pay for the costs of a QDRO. Instead, she withdrew the entire balance of the profit sharing plan on September 15th and 16th, 2011. After deductions for an outstanding loan of $5,876.68, federal income taxes of $5,966.66, and a forfeiture of $8,177.28, she received the net sum of $15,989.98 from the plan.[4]

---

[2] *Id.* at 3.

[3] *Id.* at 4.

[4] Creditor's Ex. C. The forfeiture was incurred because Ms. Guthrie was only 80% vested in the plan.

Sarah filed for chapter 13 relief on October 3, 2011. David filed a proof of claim as a priority creditor for $23,707.71.[5] He claimed priority status under 11 U.S.C. § 507(a)(5), for contributions to an employee benefit plan. After a brief hearing on February 21, 2012, and the filing of additional pleadings by Sarah, an evidentiary hearing was set for April 6, 2012 to determine the nature of David's claim. The issue presented is whether the obligation imposed by the state superior court as to Sarah's profit sharing plan is a domestic support obligation entitled to priority under 11 U.S.C. § 507(a)(1)(A) and 11 U.S.C. § 101(14A), or whether it is instead a property settlement provision, which would be a general unsecured claim in this bankruptcy proceeding.

A chapter 13 plan must provide for full payment of all claims entitled to priority under 11 U.S.C. § 507.[6] Domestic support obligations receive first priority under § 507(a)(1). Such obligations are defined in 11 U.S.C. § 101(14A), which provides:

> (14A) The term "domestic support obligation" means a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is–
>
> (A) owed to or recoverable by–
>
> (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian or responsible relative; or

---

[5] Claim No. 9-1, filed Dec. 12, 2011.

[6] 11 U.S.C. § 1322(a)(2).

3

    (ii) a governmental unit;

  (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;

  (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason applicable provisions of–

    (i) a separation agreement, divorce decree, or property settlement agreement;

    (ii) an order of a court of record; or

    (iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and

  (D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.[7]

  The issue presented here is whether the obligation Sarah owes to David is "in the nature of alimony, maintenance, or support . . . without regard to whether such debt is expressly so designated."[8] The other requirements of § 101(14A) are met. The debt to David

---

[7] 11 U.S.C. § 101(14A).

[8] 11 U.S.C. § 101(14A)(B).

4

arose before the order for relief. David is Sarah's former spouse, and the debt was established by a court of record.

A bankruptcy court is not bound by the state court's treatment of a divorce obligation when determining whether a debt is in the nature of support.[9] The Ninth Circuit has listed a number of factors to be considered when determining whether an obligation is one for property settlement or support:

> [T]he court must look beyond the language of the decree to the intent of the parties and to the substance of the obligation . . . If an agreement fails to provide explicitly for spousal support, a court may presume that a so-called "property settlement" is intended for support when the circumstances of the case indicate that the recipient spouse needs support. Factors indicating that support is necessary include the presence of minor children and an imbalance in the relative income of the parties. Similarly, if an obligation terminates on the death or remarriage of the recipient spouse, a court may be inclined to classify the agreement as one for support . . . Support payments tend to mirror the recipient spouse's need for support. Thus, such payments are generally made directly to the recipient spouse and are paid in installments over a substantial period of time.[10]

The Ninth Circuit BAP subsequently dealt with the property settlement – support distinction in *Leppaluoto v. Combs*.[11] The BAP stated:

---

[9] *Shaver v. Shaver*, 736 F. 2d 1314, 1316 (9th Cir. 1984).

[10] *Id.* at 1316 -1317 (citations omitted).

[11] *Leppaluoto v. Combs (In re Combs),* 101 B.R. 609 (B.A.P. 9th Cir. 1989).

5

In order to determine whether a debt is a nondischargeable spousal support obligation or a dischargeable property settlement, the court must ascertain the intention of the parties at the time they entered in their stipulation agreement, and not the current circumstances of the parties. The court should look to the substance of the obligations in the agreement, and generally should disregard labels and titles. If the provision's intended function is to provide a necessity of life, it is ordinarily held to be nondischargeable maintenance support.

. . . .

Bankruptcy courts have employed various factors to determine the intent of the parties of an ambiguous divorce decree. Some of these factors include:

1. The label given to the payments;

2. The context or location of the disputed provision in the decree;

3. The parties' negotiations and understanding of the provision;

4. Whether a lump sum or periodic monthly payments were provided for;

5. The relative earning power of the parties;

6. Whether the recipient spouse would be entitled to alimony under state law;

7. Whether interest accrues on the entire debt or only on the monthly payments past due; and

6

> 8. Whether the debtor's obligation of payment terminates on the death or remarriage of the recipient, or on the death of the debtor.[12]

Applying the *Combs* factors here yields the following results. First, David's payment from Sarah's profit sharing plan was not labeled as support. The provision regarding the profit sharing plan is located in Finding No. 4 of the state court's second amended findings of fact, which states: "PROPERTY DISTRIBUTION. The parties' agreement with respect to property is as follows[.]"[13] Under this paragraph, Sarah was to receive the family home, certain personal belongings, real property she inherited in Oregon, forty percent of the May 16, 2011 value of the disputed profit sharing plan, and other items.[14] David was to receive a 1971 Chevrolet Motor Home, a steamer trunk with its contents, sixty percent of the May 16, 2011 value of the profit sharing plan, a 2005 Ford Taurus, and other items.[15] Finding No. 4 also divided the parties' debts. There is no mention of support, nor is there an evaluation of the parties' relative earning capacities. Given this context, it appears the disputed provision was intended as property division.

The third factor to consider is the parties' negotiations and understanding of the disputed provision. There is disagreement on this point. David now maintains that the

---

[12] *Id.* at 615-616 (citations omitted).

[13] Creditor's Ex. E at 2.

[14] *Id.* at 2-3.

[15] Pages 4 and 5 of Exhibit E.

7

disputed provision was intended for his support because he had been laid off from work one week prior to the scheduled mediation. Sarah contends David voluntarily left his job before the mediation, as he intended to move to Minnesota. David denies this allegation, although he has resumed his former job as an account representative for Frontier Plumbing after spending time in Minnesota. He has a bachelor's degree and many years of successful work experience. He suffers from no physical or mental disabilities. I agree with Sarah; there was no negotiation or understanding that the disputed provision was to provide for David's support or maintenance.

The fourth factor to consider is whether the disputed provision provided for a lump sum or periodic monthly payments. Here, the disputed provision gives David 60% of the value of Sarah's profit sharing plan as of May 16, 2011. I regard the this provision as a directive for a lump-sum alienation of a portion of Sarah's interest in the profit sharing plan through a QDRO. There is no provision for monthly payments. Application of this factor suggests that the disputed provision is for property settlement.

The relative earning power of the parties must also be considered. Sarah has demonstrated greater earning power over the course of the marriage. She admits to earning more than David, and he claims that she generally earned one-third more than he did on an annual basis. But the specifics of their earnings prior to the May 16, 2011 mediation are vague. David's Exhibit D contains summaries of their joint returns for 2008 and 2009. According to David, Sarah grossed $66,600.00 and he made $43,326.00 in 2008. In 2009,

8

Sarah made $79,600.00 and David again made $43,326.00. Neither party has submitted any evidence regarding the parties' 2010 income.

Kara Nyquist, David's divorce lawyer, alleges that Judge Reese gave David a 60% interest in the profit sharing plan to provide for his support due to the parties' income disparity. I reject this contention. The divorce was "resolved" through mediation. Judge Reese acted solely as a mediator, not as a superior court judge making findings in a litigated divorce. Further, as noted previously, the findings and conclusions entered in state court did not mention the parties' income or support needs.[16] The income disparity, however, is a factor that favors David in this court's determination under 11 U.S.C. § 101(14A)(B).

Under *Combs*, a court is to also consider whether David would be entitled to alimony under state law. The relevant time frame is as of May 16, 2011. As of that date, David had been unemployed for one week. Up until that time he had been able to support himself through suitable employment. He was making more than $40,000.00 a year. He did not have custody of either of the parties' two minor children. Under these circumstances, there was no need for a court to provide for his maintenance through property division or direct alimony.[17]

A court is also to determine whether interest accrues on the entire debt or only on the monthly payments past due. Here, there was no provision for interest and there were

---

[16] Considering that the parties were to each pay 50% of the cost to retain a custody investigator ($4,000.00), it does not appear that the state court considered the disparity in income significant. *See* Creditor's Ex. E at 6.

[17] *Messina v. Messina,* 583 P.2d 804 (Alaska 1978).

9

no monthly payments. The decree envisioned a one-time alienation as to a portion of the debtor's interest in the profit-sharing plan. Such a provision is consistent with a property division.

  Finally, this court must determine whether the debtor's obligation of payment terminates on the death or remarriage of the recipient. In this instance, there was no such condition, indicating that the disputed provision was property settlement.

  My review of all the relevant factors leads me to conclude that David's claim to 60% of the May 16, 2011 value of Sarah's profit sharing plan is a true property settlement agreement. The disputed provision was not intended to provide support or alimony to David. David argues that such a finding would be at odds with this court's earlier decision in *In re King*.[18] I disagree. The circumstances in *King* were substantially different than those in the instant case. Angel King was attempting to save her home following a brief marriage to Marcus King. While married, the parties had taken out a $50,000.00 second mortgage against Ms. King's home. The bulk of the funds were used to pay off Mr. King's credit card debt. The state superior court had awarded a lump sum to Angel to approximate the obligation necessary to pay the second mortgage debt over time. Angel had custody of a son from a former marriage. Without a payment from Marcus, Angel King and her son faced the loss of her home. I determined that the state court decree was entered to provide shelter to Ms. King and that such shelter was necessary for her support.

---

[18] 9 A.B.R. 500, 461 B.R. 789 (Bankr. D. Alaska 2010).

10

Here, in contrast, it is Sarah who has primary legal and physical custody of one of the couple's minor children.[19] David doesn't have physical custody of either of the couple's minor children, and he is capable of earning sufficient income to provide for his own needs. The award of an interest in Sarah's profit sharing plan was not made to provide a necessity of life to David. It was simply a property division arrived at through mediation, with none of the detailed findings present in the King case. *King* does not aid David.

David does not have a priority claim for support under § 507(a)(1). Instead, he holds a general unsecured claim for a property settlement obligation. The proper amount of David's claim must also be determined. David alleges he is owed $23,707.71. This represents 60% of Sarah's account balance as of March 31, 2011.[20] The balance in her profit sharing plan stayed relatively constant through the period ending June 30, 2011.[21] Sarah says that the claim is overstated and that it should be discounted to $11,484.23. To reach this sum, she discounts the claim with a loan ($6,114.83) against the fund and her federal income taxes. I agree that the loan should be deducted to determine the value of the profit-sharing plan as of May 16, 2011. I disagree, however, with her contention that her federal income tax liability is a proper deduction against David's share of the plan. David was entitled to 60% of the value of the plan or roughly $20,228.05. Following the filing of a QDRO, he would pay tax on any distribution received because the plan was funded with pre-tax dollars.

---

[19] The other minor child now resides with a different family.

[20] Creditor's Ex. B.

[21] Creditor's Ex. A.

11

His tax liability would be based on his other income and withholding, not on the amounts paid by Sarah.  I will allow David's claim as a general unsecured claim in the sum of $20,228.05.  Sarah argues that David's claim should be further reduced by offsets for unpaid child support and other unpaid obligations arising under the divorce decree.  I decline to address those issues here.  They should instead be addressed in state court.

DATED:  April 18, 2012.

BY THE COURT

/s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:   F. Cahill, Esq.
         D. Guthrie, Pro Se Creditor
         L. Compton, Trustee
         U. S. Trustee

04/18/12